CORRAL CREEK CATTLE CO., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Corral Creek Cattle Co. v. Commissioner
Docket Nos. 4277-74, 4278-74, 4279-74.
United States Tax Court
T.C. Memo 1978-260; 1978 Tax Ct. Memo LEXIS 252; 37 T.C.M. (CCH) 1121; T.C.M. (RIA) 78260; July 17, 1978, Filed *252 During 1970, Foxley, a partnership, was defrauded of money. Held, on February 28, 1971, the end of Foxley's tax year, petitioners, as partners in Foxley, had no reasonable prospects of recovering more than $ 3,773 of the amount lost. Held further, petitioner Foxley & Co. may not deduct rental expenses covering the period Nov. 1, 1966 through Feb. 28, 1967, on its income tax return filed for the period ending Feb. 29, 1968. T. Geoffrey Lieben, for the petitioners. Wayne B. Henry, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Tax Year Petitioner
Ended
Deficiency
Corral Creek Cattle Co.
Feb. 28, 1969
$ 2,834.00
Feb. 28, 1970
10,113.00
Five Dot Livestock Co.
Feb. 29, 1968
13,883.00
Feb. 28, 1969
53,084.00
Foxley & Co.
Oct. 31, 1965
8,106.00
Oct. 31, 1966
2,839.00
Feb. 29, 1968
135,773.63
Feb. 28, 1969
24,679.31
Feb. 28, 1970
1,435.20
There are two issues for resolution. First, we must decide whether petitioners had reasonable prospects of recovering on claims for reimbursement of losses. If so, petitioners are not entitled to section 165 [2] loss deductions. [3] Second, we must decide *253 whether a portion of rental expenses deducted by Foxley & Co. on its return for the tax year ended February 29, 1968, should have been deducted on the preceding year's tax return.
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Corral Creek Cattle Co., Five Dot Livestock Co., and Foxley & Co., are Nebraska corporations, with their principal offices in Omaha, Nebraska. For years prior to and including the tax year ended February 29, 1968, petitioners timely filed their Federal income tax returns with the District Director of Internal Revenue, Omaha, Nebraska. Thereafter, petitioners filed their Federal income tax returns with the Internal Revenue Service Center in Kansas City, Missouri. Petitioners compute their taxable income using an accrual method of accounting. On March 1, 1968, petitioners and a fourth corporation, Foxley & Sons Co., formed *254 a joint venture, Foxley Cattle Co. (hereinafter Foxley). Foxley filed partnership returns for the tax years ended February 28, 1969, February 28, 1970, and February 28, 1971, with the Internal Revenue Service Center, Kansas City, Missouri. Foxley was formed to carry on cattle feeding operations previously conducted by the joint venturers individually. In the course of its cattle feeding business Foxley contracted with Agri-Land & Beef, Inc. (hereinafter Agri-Land), a commercial feed lot and pasture operation. Agri-Land, a Nebraska corporation, was 100 percent owned by Howard Richter and his wife. Richter was also its president. By November 1, 1970, Agri-Land had feeding agreements covering approximately 3,000 head of Foxley's cattle. During November 1970, Foxley agreed to purchase 1,261 head of cattle from Agri-Land, all of which were allegedly located on leased property referred to as the Larsen farm. Foxley executed and delivered a check of $ 243,621.31 in payment for the Larsen cattle. In fact, there were only 739 head of cattle on the Larsen property, all of which were subject to security interests held by Production Credit Association of South Omaha (hereinafter PCA). 1,802 *255 head of cattle from Agri-Land which were allegedly located on the Nygren farm, property leased by Agri-Land for feeding purposes. Foxley executed and delivered a check for $ 326,353.20 in payment for the cattle. Although Agri-Land claimed to have good title to the cattle located on the Nygren farm, these cattle were in fact owned by two unrelated individuals. Because of rumors concerning Agri-Land's business practices and solvency, Foxley, on December 3, 1970, retained a law firm for advice on how to protect Foxley's interests and recover the $ 569,974.51 recently paid to Agri-Land for cattle. In an attempt to secure its interest in Agri-Land's assets, Foxley on December 4, 1970, removed 4,111 head of cattle from the Nygren farm. Although these cattle remained in Foxley's possession for a time, they were owned by unrelated third parties to whom they were ultimately returned. On December 7, 1970, Foxley filed suit against Agri-Land, Richter, and the Bank of Mead on grounds of fraud, in an attempt to recover the $ 326,353.20 paid on December 1, 1970, for the cattle located on the Nygren farm. The Bank of Mead was joined as a defendant in this suit under a theory that the bank, through *256 its president Kenneth Schuette, had fraudulently misrepresented to Foxley that Agri-Land had good title to the Nygren cattle and was able to deliver the cattle free and clear of encumbrances. After Foxley filed suit against Agri-Land, Richter, and the Bank of Mead, its prospects of recovering any significant portion of the amount prayed for rapidly deteriorated. On December 7, 1970, PCA, one of Agri-Land's secured creditors, took possession of Agri-Land's feed lot. Included in this possession were all 739 head of cattle on the Larsen farm.On December 24, 1970, Agri-Land filed a petition under Chapter XI of the Bankruptcy Act in the United States District Court for the District of Nebraska alleging that its liabilities exceeded its assets by approximately $ 60,000. This $ 60,000 figure was, however, a conservative estimate. In fact, Agri-Land's assets were grossly overstated, assets were valued at fictional and inflated amounts, and at least one large "unliquidated claim" never existed. Further, Agri-Land's liabilities were understated. They failed to include approximately $ 570,000 owed to Foxley for cattle never delivered, $ 263,625 owed to a third party, and failed to include *257 a secured claim of $ 140,000. During the months of December 1970, and January and February 1971, Foxley's attorneys and accountants reviewed Richter's and Agri-Land's property holdings, all financing statements securing interests therein, and any available books and records. By December 10, it was determined that there was substantially "no equity in Richter or Agri-Land." Virtually all of their assets were subject to security agreements, and all finaning statements appeared to have been properly filed. The only property available for attachment appeared to be three cars with a total value of approximately $ 7,000, and Richter's home in which he had an equity of approximately $ 23,000. In a bankruptcy proceeding, however, any unsecured property would be used to satisfy expenses of administering the bankruptcy estate and pay both Federal and state taxes before an unsecured creditor such as Foxley would be able to satisfy its claims. With this pessimistic prospect of recovery, Foxley's legal counsel and accountants felt that as of February 28, 1971, the best Foxley could expect to collect from Richter and Agri-Land was $ 3,773 of its approximate $ 570,000 claim. Even so, counsel *258 advised its client to protect what interests it had by attempting to force PCA, the primary secured creditor, to trial on its claims, thereby hoping to force some form of settlement. Realizing that the possibility of recovering from either Richter or Agri-Land was slight, Foxley's counsel joined Bank of Mead as a party defendant in the fraud suit filed December 7, 1970. Foxley's suit against the bank was entirely based on a misrepresentation allegedly made to one of Foxley's employees during a one or two minute telephone conversation that occurred on December 1, 1970. Allegedly, prior to Foxley's December 1, 1970, purchase of cattle from Agri-Land, one of Foxley's accountants, a Mr. Holzapfel, spoke with Kenneth Schuette, the bank's president. During this conversation Holzapfel inquired whether Agri-Land had good title to the cattle, and allegedly Schuette responded that it had, that the proper title papers were held by a correspondent bank, and that he had personally seen the cattle that morning. Foxley alleged that relying on this false representation, it purchased cattle on December 1, 1970, from Agri-Land. In evaluating the potential success of this suit against Bank of Mead, *259 Foxley's counsel noted various discrepancies and weaknesses. First, there was evidence that Foxley purchased the cattle from Agri-Land before Holzapfel's conversation with Schuette. Second, one of PCA's employees informed Foxley after the purchase, but before Foxley's check to Agri-Land was cashed, that PCA had secured interests in the recently purchased cattle. Third, Foxley's suit against the bank relied entirely on an uncorroborated telephone call lasting less than two minutes. There was no certainty that any misrepresentation was made, or if made, was of such a nature that Foxley had any right to rely on it. Other problems also existed: Bank of Mead's total assets were $ 150,000, significantly less than the amount by which Foxley was defrauded; and the lawsuit against Bank of Mead would be before a jury in the county where Bank of Mead was located. Foxley's attorneys feared that local bias in favor of a local bank, and against a large company would significantly hurt Foxley's chance of winning a fraud suit against the bank. The total effect of all these problems was that Foxley's attorneys believed chances of recovery were very, very slim. After reviewing all the information *260 Foxley received from its independent investigation conducted by both its accountants and attorneys, Foxley deducted the entire amount of the purchase price paid for both the Larsen and Nygren cattle from its closing inventory. The effect of this was to increase its cost of goods sold, and thereby decrease its profits for the fiscal year ended February 28, 1971. On March 1, 1965, petitioner Foxley & Co. entered into a lease agreement with a testamentary trust established by William J. Foxley's will. The lease agreement required a base rental of $ 3,000 per month and an additional rental of 50 percent of Foxley & Co.'s annual net profits in excess of $ 10,000 per year. Foxley & Co.'s net profit from its feed lot operation was determined on the basis of the company's fiscal year ending October 31. Effective November 1, 1966, Foxley & Co. changed its fiscal year from October 31 to February 28. Rental, however, was still computed on the October 31 fiscal year. On December 26, 1967, Foxley & Co. agreed to change the fiscal year for computing rental payments to the fiscal year ending February 28. This change was made effective for the period following October 31, 1967. On its income *261 tax return filed for the period ending February 29, 1968, Foxley & Co. deducted rental payments made to the trust covering the period November 1, 1966 through February 29, 1968. ULTIMATE FINDINGS OF FACT As of February 28, 1971, there existed no reasonable prospect of recovering more than $ 3,773 of the amount Foxley paid for cattle during November and December of 1970. OPINION There are two issues we must resolve. First, we must decide whether Foxley, on February 28, 1971, had reasonable prospects of recovering amounts paid for cattle which were never delivered. If so, Foxley was not entitled to a deduction for losses incurred when it was defrauded on two cattle purchases. The second issue we must decide is whether Foxley & Co. should have deducted a portion of a rental expense in its tax year ended February 28, 1967, rather than in its tax year ended February 29, 1968. Generally, section 165 allows a deduction for losses sustained during a tax year. If, however, a loss occurs and at the end of the tax year "there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which [there exists such *262 a reasonable prospect of recovery may be deducted]." Sec. 1.165-1(d)(2)(i), Income Tax Regs. Whether a reasonable prospect of recovery on a claim exists is strictly a factual question. Sec. 1.165-1(d)(2)(i), Income Tax Regs.
The test to be applied in determining the year of deduction is a practical one. In Boehm v. Commissioner,326 U.S. 287, 293 (1945), relying on Lucas v. American Code Co.,280 U.S. 445, 449 (1930), the Supreme Court stated that, "no definite legal test is provided by the statute for the determination of the year in which the loss is to be deducted. The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal, test." In applying this practical test, we may look at the taxpayer's attitude and conduct, but these subjective factors are not conclusive. We must also look at all the facts before us and draw from them all reasonable inferences and conclusions. Boehm,supra at 293. In considering these facts we should apply a standard of "foresight, and hence * * * not look at facts whose existence and production for use in later proceedings was not reasonably foreseeable as of the close of the particular *263 year." Ramsay Scarlett & Co. v. Commissioner,61 T.C. 795, 811 (1974), affd. 521 F. 2d 786 (4th Cir. 1975). In sum, we must look at those facts available to Foxley on February 28, 1971, and determine if, at that time, Foxley, as a practical matter, had reasonable prospects of recovering the amounts it lost on the cattle purchases from Agri-Land. Initially, we note that the parties agree Foxley was defrauded of $ 569,974.51 when it paid Agri-Land for cattle in November 1970, and on December 1, 1970. The cattle Foxley paid for were either owned by other parties, subject to security interests, or nonexistent. Therefore, the only question we have is whether on February 28, 1971, Foxley had reasonable prospects of recovering on claims against Richter, Agri-Land, and Bank of Mead. After considering the pertinent facts, we conclude that as of the close of its tax year, February 28, 1971, Foxley did not have reasonable prospects of recovering more than $ 3,773 on its claims. A review of these facts convinces us that Foxley's attempts to protect itself were all but hopeless. Nevertheless, considering the magnitude of its losses, we believe any prudent businessman would have attempted *264 to protect himself by filing claims against the defrauding parties even though chances of recovery were significantly less than reasonable. On December 3, 1970, after hearing that Agri-Land's business practices were questionable and that Agri-Land was approaching insolvency, Foxley retained lawyers for advice on how to protect itself. Following consultation, Foxley took possession of 4,111 head of cattle, hoping to secure its rights to the cattle. Unfortunately all of these cattle were either owned by unrelated third parties or secured by PCA for credit given to Agri-Land. In an effort to protect itself Foxley had its lawyers locate Richter's and Agri-Land's property. After investigation in December, Foxley's attorneys concluded that both Richter and Agri-Land were virtually judgment-proof. Agri-Land, which filed under Chapter XI of the Bankruptcy Act, readily acknowledged its liabilities exceeded its assets. Foxley's attorneys, after looking at the balance sheet filed by Agri-Land, believed its financial condition was significantly worse than stated and anticipated Agri-Land being forced into straight bankruptcy. To make matters worse, Foxley, as a general creditor, would *265 not be entitled to levy on any property subject to properly perfected security agreements until the secured parties' interests were satisfied. It was the opinion of Foxley's counsel after locating most of Agri-Land and Richter's assets that virtually all assets were subject to properly perfected security agreements, most of which were held by PCA. Foxley's counsel attempted to assure its client some interest in Agri-Land's assets by developing a theory of "inverse order of alienation." Under this theory secured creditors would be required to satisfy their claims out of secured property before they could attach general assets. The only problem with this theory, however, was that after secured creditors' interests were satisfied, and after costs of administrative and Federal and State tax obligations were paid, there would probably be only de minimus assets left from which to satisfy Foxley's claims. Foxley's primary hope of finding a solvent defendant rested in its claim against Bank of Mead. The basis of Foxley's suit against Bank of Mead was that Mead's president, Kenneth Schuette, made fraudulent misrepresentations during a telephone conversation, lasting less than two minutes, *266 with one of Foxley's accountants. During this telephone call Schuette allegedly assured Holzapfel, Foxley's employee, that the Nygren cattle, the subject of Foxley's December 1, 1970, purchase, were free of any liens; that Schuette had seen the cattle that morning; and that the documents of title were held at a correspondent bank. Foxley's fraud theory against Bank of Mead was based on its alleged reliance on Schuette's misrepresentations. Facts concerning Foxley's reliance, however, were not entirely clear. There was evidence that Foxley paid for the cattle prior to the telephone conversation with Schuette. Further, before Foxley's check was cashed, one of PCA's employees informed Foxley that the cattle purchased on December 1, 1970, may have been subject to prior security agreements. Other problems were presented by a fraud suit against Bank of Mead: Foxley's case was built around a very short telephone conversation, and Foxley's primary witness was regarded as a weak witness; the lawsuit against Bank of Mead was to be tried before a jury in the county where the bank did business; and Bank of Mead's net assets were $ 150,000, less than enough to satisfy Foxley's claim. Indeed, *267 Foxley's attorney evaluated the chance of success as very, very slim. [4]
In sum, Foxley's chances of recovering any significant portion of its claims against Richter, Agri-Land, or Bank of Mead, appeared, on February 28, 1971, to be anything but reasonable. Consequently, Foxley was properly entitled to deduct under section 165, the unrecovered amount it lost as a result of the fraudulent cattle purchase. Although it is remotely possible that Foxley may some day recover some of its claim against the three defendants, this will not provide Foxley with a windfall, and indeed will not deprive the Commissioner of revenue, since under section 1.165-1(d)(2)(iii), Income Tax Regs., and subject to section 111, Foxley must *268 include the amount of any reimbursement in its gross income for the taxable year in which received. The second issue we must decide is whether any part of rental expenses deducted by petitioner Foxley & Co. in its tax year ended February 29, 1968, should have been deducted in its tax year ended February 28, 1967. On March 1, 1965, Foxley & Co. entered into a lease agreement with a testamentary trust established by the will of William J. Foxley. Under this lease agreement Foxley & Co. was to pay the trust rental of $ 3,000 per month plus 50 percent of Foxley & Co.'s annual net profits in excess of $ 10,000. Net profits were determined on Foxley & Co.'s fiscal year ending October 31. Effective November 1, 1966, Foxley & Co. changed the end of its fiscal year from October 31 to February 28. The lease agreement between Foxley & Co. and the trust was not modified to conform with the change in Foxley & Co.'s fiscal year until December 26, 1967. On that date the parties agreed that for the period commencing after October 31, 1967, net profits would be computed on a fiscal year ending on the last day of February. On its Federal income tax return for fiscal year ending February 29, *269 1968, Foxley & Co. deducted as a rental expense rents paid to the testamentary trust for the period November 1, 1966 to February 29, 1968. Respondent contends that $ 9,945.13 of the rent deducted on the return for the period ending February 29, 1968, should have been deducted on petitioner's preceding return since it was attributable to the period November 1, 1966 through February 28, 1967. Petitioner, in contrast contends that under its agreement with the trust its rental liability for the period November 1, 1966 through February 28, 1967, did not accrue until the tax year ended February 29, 1968. We disagree with petitioner. Generally, a taxpayer on an accrual method of accounting may deduct expenses in the taxable year for which all events have occurred so that the fact of liability and the amount thereof can be determined with reasonable accuracy. Sec. 1.461-1(a) (2), Income Tax Regs. The method used by a taxpayer in reporting income must be consistently used by the taxpayer so that it clearly reflects income. Sec. 1.446-1(c)(1)(ii), Income Tax Regs.
In the case before us Foxley & Co. was required to pay rental income based in part on its net profits. Prior to Foxley & Co.'s *270 change in its annual accounting period, net profits for purposes of rental payment were determined at the end of its fiscal year. One year following Foxley & Co.'s change in its annual accounting period and for all subsequent years, the net profits, for purposes of rental payment, were determined at the end of Foxley & Co.'s fiscal year. Foxley & Co., however, deviated from this consistent pattern of determining net profits, for purposes of rental payment, during its period of transition from an October 31 fiscal year to a February 28 fiscal year. The effect of this deviation was that rental payments based on Foxley & Co.'s profits during the period November 1, 1966 through February 28, 1967, were not deducted on Foxley & Co.'s income tax return covering the same period. Rather, they were deducted on the return of the following year ending February 29, 1968. Foxley & Co.'s rental expense deduction on its return for the period ending February 29, 1968, therefore covered a period of 16 rather than 12 months. Since Foxley & Co. deviated from its consistent pattern of determining rental expenses based on its profits determined at the end of its fiscal year, and since this deviation *271 resulted in a deduction covering a period extending beyond Foxley & Co.'s annual accounting period, the deduction materially distorted Foxley & Co.'s income. Therefore, to the extent Foxley & Co. deducted rental expenses attributable to the period November 1, 1966 to February 28, 1967, on its income tax return filed for the period ended February 29, 1968, Foxley & Co.'s rental expense deduction must be denied. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners were consolidated: Five Dot Livestock Co., and Foxley & Co.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in question. ↩
3. This issue is before us as a result of net operating loss carrybacks from a loss sustained by the Foxley Cattle Co. joint venture in its fiscal year ended February 28, 1971.↩
4. As part of his argument respondent alleges that Bank of Mead was covered by a $ 1,000,000 bond to protect the bank from fraudulent acts of its employees. While the bond was large enough to cover Foxley's claim against the bank, Foxley still had to win an unpromising lawsuit. Further, respondent has not satisfactorily persuaded us that the bond in question would cover the alleged misrepresentations made by Schuette, and hence, provide a source for satisfying Foxley's claim.↩